UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION

*FILED*
AUG 11 2010
U.S. CLERK'S OFFICE
DISTRICT BANKRUPTCY COURT
BALTIMORE MARYLAND

In re:                                    *        Chapter 7

Fred Waters Allnutt                       *        Case No. 10-24504

        Debtor.                           *

*     *     *     *     *     *     *     *     *     *     *     *     *     *     *

## DEBTOR's MOTION TO REMOVE MARK J. FRIEDMAN AS
## CHAPTER 7 TRUSTEE IN THE INSTANT BANKRUPTCY CASE

Comes now, Fred Allnutt, Debtor (hereinafter, "Allnutt"), pursuant to 11 U.S.C. § 324(a), and files this Motion to Remove Mark J. Friedman As Chapter 7 Trustee In The Instant Bankruptcy Case, and for this states as follows:

1.     In support of this Motion, Allnutt files concomitant herewith his Affidavit Of Fred W. Allnutt In Support Of Debtor's Motion To Remove Mark J. Friedman As Chapter 7 Trustee In The Instant Bankruptcy Case (hereinafter, "*Allnutt Affidavit*").

2.     On October 9, 1992, Allnutt filed for Chapter 11 Bankruptcy protection, commencing Bankruptcy Case # 92-5-7401, after the Internal Revenue Service seized his business and other assets.

3.     On October 29, 1992, Mark J. Friedman, Attorney, Piper & Marbury, 36 South Charles Street, Baltimore, Maryland 21201, was appointed Chapter 11 Trustee to administer Allnutt's Bankruptcy Estate in Case number # 92-5-7401 (Allnutt Affidavit, page 1, ¶ 4). This is the same Mark J. Friedman (hereinafter, "Friedman") that is Chapter 7 trustee in the instant case.

4.     In September 1994, after finding mathematical errors amounting to many thousands of dollars in the Monthly Operating Reports filed by Friedman, Allnutt developed a simple spreadsheet (*Allnutt Affidavit, page 2, ¶ 7*) information contained in the Reports that Friedman

filed for the August 1, 1993, and July 31, 1994, time frame. Allnutt's spreadsheet confirmed that Friedman had failed to account for $596,532.02 of Allnutt's estate funds during this time period.

5.    After Allnutt forwarded a copy of his spreadsheet to Friedman and ask him to explain the discrepancies he noted, he received an undated letter (received on September 29, 1994) from C.W. Amos & Company, LLC (hereinafter, "Amos"), with an attached "Analysis of 'receivables not accounted for' per schedule prepared by Fred W. Allnutt, Sr." (*Allnutt Affidavit, page 2, ¶ 8*). In its cover letter, Amos stated: "Your analysis correctly identified a difference between the monthly change in Accounts Receivable and the collection of cash. In our analysis we have identified the three different types of transactions that reconcile to the column in your schedule labeled 'Receivables Not Accounted For. '" The three "transactions" Amos identify are:

> ➤ A/P & A&R Swap
> ➤ Write-offs of Accounts Receivable
> ➤ Allowance for Doubtful Accounts

6.    In both its letter and its analysis, Amos acknowledges that there is "Receivables Not Accounted For" in the amount of $599,977.08, a sum that is $3,445.06 higher than the amount Allnutt found. Further review and additional information has now shown that the amount of missing receivables is much greater than either Amos' or Allnutt's total.

7.    Amos also revealed, for the first time ever, in column's (C), (D), & (E) in its analysis, that "Swaps" of account receivable and account payable had occurred in the amount of $300,167, that write-offs had occurred in the amount of $287,618.08, and that $12,192 was placed in an "Allowance for Doubtful Accounts." How a "doubtful" account can change the receivable balance is a mystery to Allnutt. Moreover, none of these three items noted by Amos are listed in Friedman's Monthly Operating Reports, and Amos fails to explain why. Assuredly, if they are correct, Friedman should have included them in his Monthly Operating Reports, even if the entailed re-filing accurate reports (*Allnutt Affidavit, page 3, ¶'s 10, 11, & 12*).

8.     Simply put, Amos' analysis does not verify Friedman's Monthly Operating Reports. This fact alone makes Friedman's accounting of Allnutt's estate funds suspect.

9.     On September 29, 1994, Allnutt wrote a letter (*Allnutt Affidavit, page 3, ¶ 13*) to Amos outlining many of inconsistencies in their analysis and asked them to provide Allnutt certain records to support their analysis.

10.    Amos did not respond to Allnutt's letter or provide any of the records Allnutt requested.

11.    Instead of responding to Allnutt's questions and providing the records Allnutt requested, Amos forwarded a second letter (*Allnutt Affidavit, page 3, ¶ 14*) dated October 4, 1994, with a second analysis attached. This analysis contains new categories and amounts that are greatly different than the categories and amounts listed in Amos' first analysis. They are: Regarding Friedman's Monthly Operating Report for the period 11/1/93 to 12/31/93:

i.     In its first analysis Amos lists $119,093.83 in "A/P & A/R Swap". In its second analysis, Amos' lists $218,641.00 in "A/P & A/R Swap" for the same period. Incredibly, in the five day time period between September 29, 1994, and October 4, 1994, which includes a weekend, Amos changed its "A/P & A/R Swap" from the $119,093.83 to $218,641.00, an increase of $99,547.17, and did so without any explanation.

ii.    Under its column titled "Write-offs of Accounts Receivable," Amos lists zero "Write-offs" in its first analysis. In its second analysis, Amos re-titled this category as "Reduction for Adjustments and Credit Memos" and lists $85,783.

iii.   Amos' first analysis does not contain a category titled "Previously Unrecorded Sales." Amos' second analysis contains a category titled "Increase For Previously Unrecorded Sales" and lists $164,095 in this category.

iv.     Amos' first analysis does not contain a category titled "Item not listed on Cash Receipts Analysis (Bracciale)." Amos' second analysis contains a category titled "Item not listed on Cash Receipts Analysis (Bracciale)" and lists $2,297 in this category. Of course, this begs the question: Why didn't Friedman list the Bracciale revenue on the Cash Receipts Analysis?

Regarding Friedman's Monthly Operating Report for the period 1/1/94 to 1/31/94:

i.      Amos' first analysis, under "Write-offs of Accounts Receivable," Amos records a Write-Off amount of $48,746. Amos' second analysis, which titled this category as "Reduction for Adjustments and Credit Memos," lists $50,190.

ii.     Amos' first analysis does not contain a category titled, "Increase for Previously Unrecorded Sales." Amos' second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $900.00 in this category.

Regarding Friedman's Monthly Operating Report for the period 2/1/94 to 2/28/94:

i.      Both of Amos' analysis list "A/P & A/R Swap" as $117,408. However, Friedman shows an Accounts Payable balance of $121,888.18,[1] and that he dispersed $13,390.50 of this amount by check[2] and that $25,953.39 remained unpaid.[3] When we subtract $13,390.50 and $25,953.39 from the $121,888.18 Accounts Payable balance Friedman lists, we establish that Friedman could only have swapped $82,544.29, not the $117,408 posted by Amos.

ii.     Amos' First analysis lists $17,435 in "Write-offs of Accounts Receivable."

iii.    In its Second analysis, Amos re-titled this category as "Reduction for Adjustments and Credit Memos," and listed $18,975.

iv.     Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."

v.      However, Amos' Second analysis does contain a category titled "Increase for Previously Unrecorded Sales" and lists $1,540 in this category.

---

[1] Monthly Operating Report for 1/1/94 - 1/31/94, Bankruptcy Case # 92-5-7401, Docket No. 295, page 10.
[2] Monthly operating report for 2/1/94 - 2/28/94, Bankruptcy Case # 92-5-7401, Docket No. 304, page 22.
[3] Monthly operating report for 2/1/94 - 2/28/94, Bankruptcy Case # 92-5-7401, Docket No. 304, page 9.

Regarding Friedman's Monthly operating report period 3/1/94 to 3/31/94:

    i.    Amos' First analysis lists $19,946.87 in "Write-offs of Accounts Receivable."

    ii.    In its Second analysis, Amos re-titled this category as "Reduction for Adjustments and Credit Memos," and listed $23,962.

    iii.    Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."

    iv.    Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $3,745.

Regarding Friedman's Monthly operating report period 4/1/94 to 4/30/94:

    i.    Amos' First analysis lists $7,786.62 in "Write-offs of Accounts Receivable."

    ii.    In its Second analysis, Amos re-titled this category as "Reduction for Adjustments and Credit Memos," and listed $10,975.

    iii.    Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."

    iv.    Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $2,443.

Regarding Friedman's Monthly operating report period 5/1/94 to 5/31/94:

    i.    Amos' First analysis lists $10,342 in "Write-offs of Accounts Receivable."

    ii.    Amos' Second analysis, wherein Amos re-titled this category as "Reduction for Adjustments and Credit Memos," lists $10,882.

    iii.    Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."

    iv.    Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $540.

12.    On January 3, 1995, Allnutt received a third analysis from Amos (*Allnutt Affidavit, page 6, ¶ 16*) showing Adjustments/Credits of $276,869 in September 1994 and $12 in October 1994. These items are not listed in Amos' previous analyses. Also, they are not found in the Monthly Operating Reports Friedman filed for September and October 1994

13.    On March 23, 1995, Allnutt received a fourth analysis from Amos (*Allnutt Affidavit, page 6, ¶ 17*) that showed Adjustments/Credits of $3,452 in November 1994, $72,096 in December 1994, and $2,660 in January 1995. Once again, Friedman's Monthly Operating Reports for November and December 1994, and January 1995, do not list these Adjustments/Credits.

14.    On August 29, 1997, Allnutt received a fifth schedule from Amos (*Allnutt Affidavit, page 6, ¶ 18*) This analysis does not list the $738,902 in Adjustments/Credits and the $173,266 in unrecorded sales Amos listed in its earlier analyses. Also, in the report period 1/1/94 to 1/31/94, Amos shows a negative income of $61,482 while Friedman's Monthly Operating Report for this period shows a negative income of $48,746, a difference of $12,736.

15.    Although Friedman and Amos provided Allnutt with many ever-changing analyses to justify Friedman's flawed Monthly Operating Reports, neither Friedman nor Amos provided any actual accounting records that would comply with Generally Accepted Accounting Principles (GAAP), or that would explain the many discrepancies in Friedman's accounting of Allnutt's estate's assets, i.e., verified the Monthly Operating Reports filed by Friedman.

16.    The Friedman/Amos' ever-changing analyses represent nothing more than a failed attempt to hide the errors/mistakes/inaccuracies in Friedman's Monthly Operating Reports. Had Friedman performed a full/complete/accurate/proper accounting of Allnutt's estate assets, as he is required by law to do, the creation of ever-changing spreadsheet analysis, that prove nothing, would be unnecessary.

17.    In light of the large dollar amount of the discrepancies in Friedman's accounting of Allnutt's estate, and because neither Friedman nor Amos were unable to explain those discrepancies, and upon Allnutt's recognizing that Friedman either could not or would not

provide an accurate accounting of his estate's assets, and being highly suspicious that Friedman was embezzling/stealing his estate's assets, Allnutt decided to obtain professional help.

18.    On November 18, 1994, Allnutt employed an independent accounting firm, The Kemplin Group, to conduct an independent audit of Friedman's accounting records and the Monthly Operating Reports filed by Friedman. The Kemplin Group employed four independent accountants to assist them with their audit. The Kemplin Group and the independent accountants they employed were designated as "The Kemplin Review Team" (*Allnutt Affidavit, page 6, ¶ 19*).

19.    After reviewing and auditing the records supplied to them by Friedman, The Kemplin Review Team determined that Friedman had "miss-appropriated and never accounted for, some Eleven Million Dollars ($11,000,000) of Allnutt's bankruptcy estate (*Allnutt Affidavit, pg. 7, ¶ 22*).

20.    One very large and very visible discrepancy they found in Friedman's Monthly Operating Report for the period commencing on 1/1/94 and ending on 6/30/94 is that each of the reports Friedman filed lists negative "Contract Revenue." However, the sum of the checks Friedman received and attached to his Monthly Operating Reports show that Friedman actually had positive "Contract Revenue." Those checks confirm that the amount of "Revenue" Friedman reported is actually $880,555.10 less than the "Revenue" he actually received. The following shows the report period, the revenue Friedman reported, the revenue Friedman received, and the revenue Friedman did not report:

| Report Period | Revenue Reported | Revenue Received | Revenue Not Reported |
|---|---|---|---|
| 1/1/94-1/31/94 | -48,746.00 | 455,250.00 | 503,996.00 |
| 2/1/94-2/28/94 | -17,435.00 | 21,965.00 | 39,400.00 |
| 3/1/94-3/31/94 | -19,947.00 | 11,974.00 | 31,921.00 |
| 4/1/94-4/30/94 | -8,531.00 | 19,860.00 | 28,391.00 |
| 5/1/94-5/31/94 | -10,342.00 | 17,732.00 | 28,074.00 |
| 6/1/94-6/30/94 | -183,362.00 | 65,711.10 | 249,073.10 |
| Totals | -288,363.00 | 532,192.10 | 880,855.10 |

21.    On January 26, 1995, the Kemplin Review Team met with Michael L. Atkinson, the Amos liaison who said he was "responsible for recording all accounting activity relating to the [Allnutt] Estate," at Amos' office to conduct their audit of Friedman's accounting records and the Monthly Operating Reports he filed.

22.    On January 31, 1995, Cynthia Kemplin, President of the Kemplin Group, MBA, Ph.D. issued The "Kemplin Report," which included Affidavits from each member of The Kemplin Review Team (*Allnutt Affidavit, page 7, ¶ 21*).

23.    One item in Cynthia Kemplin Affidavit attests that Friedman failed to account for a large amount of Allnutt's estate's assets: "Based on the limited records available, [The] Kemplin Group found what appears to be a combination of discrepancies, which amount to approximately $11,000,000.00, in the accounting records filed with the court" (*Allnutt Affidavit, page 7, ¶ 22 (pages must be counted as there are no page numbers on this Affidavit)*).

24.    Jeffrey Coleman, CPA, JD, and a member of The Kemplin Review Team, found, among other discrepancies he noted, that: "The Accounts Receivable reports submitted to the bankruptcy court for the period October 1992 through November 1994, reflected a discrepancies (sic) of $1,860,072 between beginning and ending balances, per the attached report" (*Allnutt Affidavit, page 7, ¶ 23*).

25.    Frank L. Reis, CPA, MBA, and a member of The Kemplin Review Team, found, amongst other discrepancies: "A difference of $ 9,529,916 exists between net income reported to the Bankruptcy Court and taxable income determined in the Disclosure Statement by C.W. Amos for the year ended December 31, 1993 as identified on my attached report. Although I realize that there can be differences between net income and taxable income, these differences are

substantial. Especially, since both net income and taxable income include the sale of the assets"

*(Allnutt Affidavit, page 7, ¶ 25).*

26.   In his "attached report," Reis stated *(Allnutt Affidavit, page 8, ¶ 26)*:

> I have noticed an error in the Application Of Chapter 11 Trustee For Final Allowance of Chapter 11 Trustee's Commission. In paragraph 49, the trustee indicates the outstanding accounts receivables as of December 15, 1994 were $831,121. In paragraph 50, the trustee explains that the Balance was determined as follows:

| | |
|---|---|
| Balance September 30, 1993 | $ 2,693,857 |
| Trustees Invoices | 888,955 |
| Collections | (1,936,903) |
| Write Downs | (664,191) |

> The actual balance using the trustee's information should be $981,718. Consequently, we have a difference of $150,597 (981,718-831,121).

27.   In his Affidavit (**Exhibit A**), Melvin E. Casby, Acc, MB, and a member of The Kemplin Review Team, attested, to the lack of a proper accounting in Allnutt's estate (Also, see *Allnutt Affidavit, page 8, ¶ 27)*:

> (1)   [The] Great Plains accounting system used by J.F.C Excavating prior to seizure was discontinued by trustee as of April 30, 1993 and a new system (Libra) was procured and implemented effective May 1, 1993.

> (2)   C.W. Amos ceased using Libra accounting system effective December 31/ 1993. C.W. Amos did not use an automated accounting software system from January 1, 1994 until January 26, 1995, time of Kemplin Group accounting analysis. When I asked Mr. Atkinson, of Amos to provide a 1994 general ledger, he said, "we closed 1993 with Libra and did not maintain its general ledger." I then asked for the manual general ledger that replaced the automated general ledger, at which Mr. Atkinson responded, "We did not maintain, a general ledger in any form after December 31, 1993." I then asked how then could he prepare financial statements, and he responded, "we use the accounts receivable cards and subsidiary journals."

> (3)   Trustee provided list of 8 accounts receivable that had been written off that totaled $597,084. The posting of only two of the accounts could be verified on the accounts receivable cards provided. They were Ratrie Shipquarters for $178,659 in June 1994 and New Panorana Development Corporation for $31,813 in September 1994. Leaving Pulte for $57,084 in November 1993; Bituminous Construction (Hanover II project) for $27,068 in January 1994; Bituminous Construction (Hanover III project) for $15,376 and $1,293 in January 1994; Heritage Heights Limited Partnership for $46,374 in September 1994; Olney Land Limited Partnership for $165,584 identified and $79,403 that was not identified in September 1994; and Kennard Warfield for $70,596 in December

1994 totaling $462,778, or 77.5% of reported write-offs were unable to be verified to and supported by the accounts receivable cards provided. Additionally, while searching the accounts receivable cards, I discovered an unidentified $42,430 credit posted to Lou Spicer on the Fallstone project indicating that not all write-offs in excess of $10,000 was provided to us for review as indicated by trustee.

(4)    Also while reviewing the accounts receivable cards I discovered a $2,783.50 credit issued to Valley Enterprises with the explanation of duplicate billings. However, there were only two debits posted to the account receivable card totalling $2,783.50 making it impossible to involve duplicate billings unless another receivable record was kept and not provided for review.

(5)    Requested and approved documentation was not present at the January 26, 1995 meeting for review and analysis.

(6)    Source documents for adjustments, write-offs, and payables/receivables off-sets were not available to verify accuracy and correctness of adjustments, write-offs and off-sets.

(7)    Income tax returns have not been filed by the trustee.

(8)    Accounting policies and procedures for the Allnutt Estate fail to conform to standards required of the Generally Accepted Accounting (Paragraph #s in original),

28.    Wayne I. Greenfeld, B.S, in Accounting (Major in Public Accounting), and automated accounting systems specialist, and a member of The Kemplin Review Team (**Exhibit B**), like Mr. Casby, found that there was no automated accounting activity and very little manual accounting on Allnutt's estate:

Upon request# Mr. Atkinson indicated that all computer related activity ceased effective 12/31/93 and if any other reports were run / they would have been used via diskette, then discarded.

He also indicated that he was unable to provide us any standard accounting records for activity since 1/1/94, stating that some journals may exist but the A/R cards are the main source of the accounting transactions and that he would initiate "swap" transactions regularly via telephone calls from Mr. Friedman.

29.    "Discarded!!!" Indeed, Friedman and Amos should be aware that 18 U.S.C. § 153 is specifically directed to trustees and other officers of the court. Section 153 relates to the knowing and fraudulent misappropriation, embezzlement, or transfer of property, or destruction of any

estate document by the trustee or by any agent, employee, or other person engaged by the trustee
or officer of the court. This certainly includes "discarding" diskettes, and "dumping" Allnutt's
Great Plains accounting software, the latter resulting in a complete loss of all of Allnutt's
automated accounting history.

30.     Ackinson would" initiate 'swap' transactions regularly via telephone calls from Mr.
Friedman" no backup and no records – definitely a recipe for shenanigans.

31.     Indeed, after dumping Allnutt's Great Plains accounting software, Friedman was
never able to recover Allnutt's accounting history to "start-up" the Libra accounting system.
Eight months and many thousands of dollars later, on December 31, 1993, Friedman abandoned
his efforts to start the Libra accounting system that he paid Amos $10,000 to purchase.
Thereafter, Friedman relied only on a manual accounting system, and it was not even remotely
possible for Friedman to account for Allnutt's very large (forty (40) million plus) estate
averaging some $2,000,000 in monthly sales utilizing a manual accounting system.

32.     Assuredly, it is beyond belief that Friedman and his accounting firm would dump an
in place and operating automated computer accounting system and lose all prior accounting
history unless there was some devious plan in the works. Assuredly, Friedman had to know that
this one act would result in the loss of his ability to maintain a proper and full accounting of a
business in bankruptcy that was averaging sales of some two million ($2,000,000) a month.
Indeed, even if Friedman was able to properly and completely account for Allnutt's estate assets
before he dumped Allnutt's automated computer accounting system, which is definitely
debatable, he completely lost that ability when he dumped Allnutt's operating automated
computer accounting system and discarded the accounting documents and history it contained.

33.     This act of dumping Allnutt's accounting history is, without a doubt, the one act that engendered the very large and very serious discrepancies that exist in Friedman's accounting of Allnutt's Bankruptcy estate, and that resulted in Friedman's inability to produce a proper and accurate accounting of Allnutt's estate in the Monthly Operating Reports he filed. It may also have been the one act that led to the loss, and possible embezzlement of millions of dollars of Allnutt's estate funds. Of course, Friedman still had to know what he was doing because he had to with the millions of dollars of missing funds. There is also the possibility that Friedman intentionally dumped Allnutt's automated accounting system so he could convolute his accounting processes and hide other, more devious, plans.

34.     To compound the problems created by the dumping of Allnutt's automated accounting system, Friedman also utilized six different bank accounts, all of which are listed in his Monthly Operating Reports. Friedman made numerous undocumented wire transfers between those accounts. The Kemplin Review Team was able to determine that undocumented wire transfers occurred, but were unable to trace them because Friedman refused to provide any documentation to support them (*Allnutt's Affidavit, page 8, ¶28 & page 8, ¶ 28*).

35.     Friedman listed the following bank accounts and account numbers in his Monthly Operating Reports, except that no number was provided for the First National Bank of Maryland (*Allnutt's Affidavit, page 12, ¶43*):

- ♦   Commercial & Farmers Bank - 1014872603.
- ♦   Commercial & Farmers Bank- 1014915503.
- ♦   Commercial & Farmers Bank - 4010797503.
- ♦   Maryland National Bank - 3822632.
- ♦   Maryland National Bank - 1030444.
- ♦   First National Bank of Maryland - no account number provided.

36.     Friedman refused to provide either an account number or an accounting for the Maryland National Bank account, wherein he may have deposited some or all of the millions of

dollars of funds that are missing and unaccounted for in Allnutt's bankruptcy estate (*Allnutt's Affidavit, page 12, ¶'s 44, 45 & 46, and page 13, ¶'s 51 & 52*).

37.    Regarding how a trustee is to handle an estate's assets, The Chapter 11 Trustee Handbook, Chapter 7, ¶ 2, states in pertinent part:

> "Generally, a trustee should <u>utilize a single banking institution</u> and should initially deposit funds to an interest-bearing account. <u>Under no circumstances may monies of separate estates be aggregated or commingled. Bankruptcy-related funds may not be deposited to the trustee's business, personal, or trust account</u> (underline added).
>
> "All trustee bank accounts should include the trustee's name, capacity as trustee for the estate, and the debtor's name and case number."

38.    Assuredly, Friedman did not need seven bank accounts, being the six listed above and the Piper & Marbury account, for Allnutt's estate. The Chapter 11 Trustee Handbook, Chapter 7, ¶ 2, makes it clear that "a trustee should utilize a single banking institution" – not three or four depending on where the Piper & Marbury account is/was located. Assuredly, depositing all revenue into one account would eliminate most, if not all, of the discrepancies and confusion that now exists because of Friedman's failure to properly account for the deposited funds, hiding bank account numbers, undocumented and unsupported wire transfers between the different bank accounts, and by not accounting for millions of dollars of Allnutt's estate funds.

39.    Each Monthly Operating Report Friedman filed contains copies of the "A/R receipts" Friedman received during each reporting period. Allnutt posted those A/R receipts on an electronic spreadsheet (*Allnutt's Affidavit, page 8, ¶ 28*) and found that they totaled $16,458,507.94 while the total A/R receipts listed by Friedman in his Monthly Operating Reports under "Total Cash Receipts" totals $16,152,427.85. Indeed, in this instance, Friedman failed to account for $306,080.09 of Allnutt's estate's assets ($16,458,507.94 actually received minus the $16,152,427.85 alleged by Friedman establishes the discrepancy of $306,080.09).

40.     Allnutt's Review of Friedman's Monthly Operating Reports for the period commencing August 1, 1993, and ending July 31, 1994, showed un-reported Cash Receipts of $596,532.02, un-recorded sales of $173,263, un-posted checks of $306,080.09, and un-approved (un-approved by the Bankruptcy Court) adjustments, credits, write-offs, and swaps of $789,394, all of which total $ 1,865,269.11 (*Allnutt's Affidavit, page 8, ¶ 29*). How Friedman could swap $789,394 is a complete mystery because Friedman failed to document those swaps. Also, it is a mystery what Friedman received in return.

41.     On August 28, 1997, Amos provided Allnutt a "sixth" analysis (**Exhibit C**) that shows that Friedman "swapped" $136,219 in his first two months as trustee, well before he could have understood, or even comprehended, the working of an extremely large excavating business, and, between October 9, 1992 and March 31,-1995, "swapped" a total of $1,818,250. This is incredible, What did Friedman receive in return for the loss of $1,818,250? Did Allnutt's estate incur a loss or obtained a benefit from the loss of $1,818,250? Perhaps a greater mystery is why Friedman resorted to "swaps" when there are other more proper and unassailable options.

42.     Actually, Allnutt's analysis (*Allnutt's Affidavit, page 9, ¶ 30*) of the Sales, Receipts, and Accounts Receivable listed in Friedman's Monthly Operating Reports filed for the period October 9, 1992 through March 31, 1995 shows un-posted and un-accounted for Cash Receipts of $1,804,252.63. Still, whether the correct amount is $1,818,250 or $1,804,252.63, it is a large sum of unaccounted for funds.

43.     On March 13, 1995, Mr. Frank L. Reis notified Allnutt (Allnutt's Affidavit, page 9, ¶ 31) that Friedman never posted a payment the cash he received from Heritage Heights-Sections 1&2.

44.     Although Friedman/Amos, provided Allnutt with many ever-changing analyses in an attempt to justify Friedman's flawed accounting records, neither provided any actual accounting

records that would comply with Generally Accepted Accounting Principles (GAAP), nor were they able to explain the many discrepancies in Friedman's accounting of Allnutt's estate's assets, or verify the information contained in the Monthly Operating Reports filed by Friedman.

45.    Friedman has admitted in his correspondence (*Allnutt's Affidavit, page 12, ¶'s 44 &45 and page 13, ¶'s 47, 48, 49, 50, 51, & 52*) that he deposited some $250,000 of Allnutt's estate's assets into a Piper & Marbury bank account(s), which provides undeniable proof that Friedman intentionally and illegally diverted Allnutt's estate assets out of Allnutt's estate and deposited them in an unauthorized account.

46.    Friedman never provided a full accounting of those funds he deposited into the Piper & Marbury bank account, or accounts as the case may be.

47.    The Rule 2014(a) Disclosure Statement Friedman file attesting that he was a "disinterested" person was knowingly false. After Allnutt learned of, and disclosed to the court, many of Friedman's connections, Friedman performed a "conflict check," something he is required to do before his appointment as Trustee and before he attests that none exist in his Rule 2014(a) Disclosure Statement, and something that he is to do at no cost to Allnutt's estate. Still, in spite of his egregious actions of not performing a "conflict check," and in spite of his action of filing a false Rule 2014(a) Disclosure Statement, and in spite of not disclosing known conflicts, Friedman charged Allnutt's estate some $10,000 to perform the "conflict check" he should have performed before filing his false Disclosure Statement, and then only after Allnutt discovered that Friedman had many conflicts of interest. Subsequently Friedman disclosed some fifty-plus connections between him, his law firm, and various customers, suppliers, and creditors of Allnutt's. One of the more egregious "interested person," which Allnutt discovered and exposed, was that William Henn, a Piper and Marbury attorney/employee, and Elizabeth Henn, IRS

District Counsel, who represented the IRS in Allnutt's bankruptcy case, were husband and wife (*Allnutt's Affidavit, page 9,¶ 32*). This is one conflict that Friedman had to be well aware of when he filed his Rule 2014(a) Disclosure Statement attesting that he had no conflicts of interest.

48.    Friedman did not file an accounting of Allnutt's estate's assets after May 2, 1995, a date occurring some four years prior to Allnutt's bankruptcy closing (*Allnutt's Affidavit, page 9,¶ 33*).

49.    On February 3, 1994, Friedman, filed a Motion for Authority to enter into settlement agreement with Charles Kevin and Donna Marie Evans (Docket Number 279 in Bankruptcy Case # 92-5-7401). In his motion, Friedman stated: "The Trustee concluded that the Evans received fraudulent transfers and/or are in the possession of property of the bankruptcy estate in a cumulative amount not less than $200,000.00..." (*Allnutt's Affidavit, page 10,¶ 37*).

50.    The items that were the subject of the Settlement Agreement filed by Friedman were designated by Friedman as the "race car assets." In various pleadings and motions submitted in the Court, Friedman listed those assets as: race car; all-aluminum car trailer and contents; two engines and certain tools and accessories; race car transmission; hydraulic lift; salamander heater; air compressor; graduated set of three (3) Snap-On brand tool boxes; extensive array of tools; expensive precision tools; tools used for the race car; other similar tools; payments in cash and by check; household items; hand tools; furniture; jewelry; payments of household expenses; mortgage payments; utility payments; insurance payments; truck; and, tools removed from the business premises (*Allnutt's Affidavit, page 10,¶ 38*).

51.    After Friedman marshaled the race car assets into Allnutt's Bankruptcy Estate, he alleged that he sold those assets to Metro Recovery, a company owned and operated by Charles Lewis, Jr., who is also employed by the auction company, Miller and Miller, Inc., the company

that purchased through Friedman millions of dollars of Allnutt's estate's assets (*Allnutt's Affidavit, page 11, ¶ 39*).

52.     On August 25, 1994, Allnutt deposed Mr. Charles Lewis, Jr., who testified under oath that he took possession of only a few items of what may have been the "Race Car Assets," that he did not take possession of the race car engine and transmission, tool boxes, tools, the truck and trailer, or household items, furniture, jewelry, etc., and that the car he took possession of had been stripped of virtually every component, that it was just a shell, and that he could not state under oath that the property he received was part of the "Race Car Assets" because there were no tags or marking on any of them (*Allnutt's Affidavit, page 11, ¶ 40*).

53.     Lewis further testified that, while Friedman told him to bid $28,000.00 for the assets, he had purchased those items for $7,000.00 and sold them for $18,000.00, and that he was paid by check. When Allnutt asked him if he had a Bill of Sale, Lewis stated that he did not. When Allnutt asked if it was common practice for Metro Recovery to sell items without a Bill of Sale, Lewis stated that it was not. When Allnutt asked if the check in payment of the race car was deposited in Metro Corporate checking account, Lewis said it was not. Upon further questioning, Lewis change his testimony and testified that he had sold the race car assets for cash, and that neither he nor anyone associated with Metro Recovery receive the cash, and that he did not know who received it (*Allnutt's Affidavit, page 11, ¶ 41*).

54.     Friedman did not file a Bankruptcy Rule 6004 (f)(1) statement on his alleged sale of the "Race Car Assets" to Charles Lewis, Jr. (*Allnutt's Affidavit, page 11, ¶ 42*)

55.     By his own admittance, Friedman spent $65,130.00 of Allnutt's estate funds for legal and associated costs to marshal the "Race Car Assets" into Allnutt's estate, which he then sold to Lewis for $7,000. This represents a loss to Allnutt's estate of over $37,000 just between

what Friedman's charged Allnutt's estate to marshal the "Race Car Assets" and the sale price of $7,000. There is, however, a much greater loss, the loss resulting from Friedman either keeping, selling, or giving to others the bulk of the $200,000 worth of assets to other undisclosed, unknown, and unreported party (*Allnutt's Affidavit, page 12,¶ 43*).

56.    When Allnutt served deposition subpoenas on the Charles Kevin and Donna Marie Evans, Friedman intervened and had the bankruptcy court quash those subpoenas. Indeed, it can only be concluded that Friedman was well aware of his actions relating to the "race car assets" and that they prove embarrassing, and maybe even criminal if a deposition occurred.

57.    Friedman did not file the required "Final Account of the administration of the estate with the court and with the United States Trustee" as required by Title 11 U.S.C. § 1106 and Title 11 U.S.C. § 704(9). Title 11 U.S.C. § 1106 establishes a statutory mandate that compels a chapter 11 trustee to file a final accounting at the close of a chapter 11 case. In defining the duties of a trustee, Title 11 § U.S.C. 1106(a), states in pertinent part: "A trustee shall . . . perform the duties of a trustee specified in . . . 704(9) of this title;". Title 11 U.S.C. § 704(9) requires a trustee to "make a final report and file a final account of the administration of the estate with the court and with the United States Trustee"

58.    Collier on Bankruptcy 15th ed., ¶ 704.13 Trustee's Duty to Make a Final Report and Final Account of Administration; § 704(9) states:

59.    "Section 709(9) requires the trustee to make a final report and file a final account of the administration of the estate with the court and with the United States Trustee. This requirement applies to trustees in chapter 11, chapter 12, and chapter 13 cases as well as to trustees in Chapter 7 cases:

"In addition, a chapter 11 trustee appointed or elected under § 1104 is required to file a final report and account of the administration of the estate with the court and the United States Trustee pursuant to § 704(9) (made applicable by 11 U.S.C. § 1106(a)(1)). The final

report should provide a complete record of the trustee's administration including the receipt of, intervening transactions involving, and distribution or disposition of all estate property at the conclusion of the trustee's administration. Because the estate ceases to exist upon confirmation, a final report and account should be filed by the trustee as soon as confirmation has occurred. If the case is either dismissed or converted to one under chapter 7, the trustee is also required to file a final report and accounting. In any event, a chapter 11 case should not be closed unless these reporting requirements have been met. Although the trustee's duty to make financial reports will terminate once the case is closed, the trustee's obligation to report criminal activity in connection with the case continues notwithstanding case closure. See 18 U.S.C. § 3057(a)" (The Chapter 11 Trustee Handbook, Chapter 11: Post-Confirmation Case Administration, subparagraph C. Post-Confirmation Reporting Requirements).

"The trustee's final report and final account should detail a complete accounting, and the report should be a running summary of the details of the administration. In both cases, the documents should conform as far as possible to the applicable official forms or the other established forms in use. All report and accounts reciting disbursement should, if possible, be accompanied by vouchers, which may be required by local rules."

60.    The Chapter 11 Trustee Handbook, Chapter 6 – Duties of a Trustee, A.- Statutory

and General Duties, states in pertinent part:

The statutory duties of a chapter 11 trustee are set forth in § 1106, which incorporates by reference certain chapter 7 trustee duties as specified in § 704.

The applicable duties prescribed by § 704 include the obligations to:

(2)    be accountable for all property received;

(5)    if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

(7)    unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

(8)    if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and

(9)    make a final report and file a final account of the administration of the estate with the court and the United States trustee.

61.    Court's have found that a trustee must file a final accounting prior to closing a case.

In re Grand Jury Proceedings, 119 B.R. 945 (E.D.Mich. 1990), the court did not mince its

words when it stated that trustee's were required to file a final account: "Section 704(9) of the bankruptcy code clearly imposes a duty upon [the trustee]." Id at 952. The court further stated, "Instead, the Court construes Section 704(9) to mean that any person who undertakes the duties of trustee—no matter how short the duration of his tenure—must file an accounting respecting what he did for that office." Id. at 955. See also: In re Hoffmeitster, 191 B.R. 875 (D.Kan. 1996). In In re Anolik, 207 B.R. 34 (Bkrtcy.D.Mass. 1997), the Anolik court found that the final account submitted by the trustees was defective because the trustee did not properly consider professional fees, trustee's commissions, and other claims.

62.    Friedman did not file a final accounting showing disbursements to professionals, taxes paid, trustee commissions, or any other relevant information, nor did Friedman provide an accounting of each bank accounts where he deposited Allnutt's estate's funds, nor did he provide the required "0" balance bank statements. Had Friedman filed a final accounting, we would be able to see what happened to the millions of dollars that are missing in Allnutt's bankruptcy estate funds, and we would see how he performed unaccounted for and unreported swaps, trade-offs, and write-offs.

63.    What constitutes a complete final account (See: Collier on Bankruptcy, 15th ed 1998 § 10.02, Form No. 10.02-1) is a complete compilation of the accounts receivable and collections, cash from the sale of property, abandon items, total receipts, total disbursements and a final balance. None of these items were performed by Friedman in Allnutt's Chapter 11 Bankruptcy.

64.    The Manual for the United States Trustees, § 8.1, sets out the criteria for a proper final account:

1.    **TRUSTEE'S FINAL REPORT (TFR)**

The final report must be prepared as soon as all assets have been liquidated, all monies collected, the bar date has expired for creditors to file claims, and all claims reviewed or determined by the court. In addition, any required tax returns should have been filed and resolved. Applications for professional compensation and expenses also should be filed prior to or along with the final report.

The final report enables the United States Trustee and any other party in interest to determine how the trustee proposes to disburse the funds.

The final report should summarize all actions taken by the trustee to administer the case. Each report must:

1. Describe specifically the disposition of each estate asset (as listed in the debtor's schedules or otherwise discovered). This requirement is met by including the Estate Property Record and Report (Form 1). See Chapter 9.B.1 of this Handbook for a description of Form 1.
2. Report all financial transactions by the trustee. This requirement is met by including the Cash Receipt and Disbursement Record (Form 2). See Chapter 9.B.2 of this Handbook for further information about Form 2.
3. Request payment of the trustee's compensation and expenses and any unpaid professional fees and expenses.
4. Report the trustee's actions on claims or their disposition.
5. Propose distribution to creditors according to § 507 and § . (See Chapter 8.R of this Handbook regarding Order of Payment.)
6. Attach original bank statements and original canceled checks (from estate accounts) received by the trustee during the case.

The United States Trustee reviews the final report to assess whether the trustee has properly and completely administered estate property. Upon completion of this review, the United States Trustee forwards the final report to the court. If there is a dispute between the United States Trustee and the trustee concerning the report, the final report will be filed and the dispute resolved by hearing before the court.

After the trustee's final report has been reviewed by the United States Trustee and filed with the court, the notice of the filing of the final report is sent to all creditors. Essentially, the notice informs creditors that the trustee's final report for the case is on file with the clerk of the bankruptcy court, that the trustee and other professionals have applied for compensation in given amounts, that the money on hand will be distributed to creditors in accordance with the bankruptcy priority laws, and that the creditors have a right to object to the trustee's report

65.    Once again, the statutory duties of a chapter 11 trustee are set forth in § 1106, which incorporates by reference certain chapter 7 trustee duties specified in § 704:

The applicable duties prescribed by § 704 include the obligations to:

(2)    be accountable for all property received; and

(7)    make a final report and file a final account of the administration of the estate with the court and the United States trustee.

## Conclusion

From facts and evidence provided by Allnutt, it is evident that Friedman failed to either "be accountable for all property received" in Allnutt's Chapter 11 Bankruptcy. Hence, Friedman is not suited or qualified, nor can he be trusted to administer Allnutt's instance Chapter 7 Bankruptcy. Moreover, Friedman is in possession, or at least knows the location of both the

funds and the property that miss-appropriated and never administered in Allnutt's Chapter 11 bankruptcy. Hence, he may become an adversary in this bankruptcy.

The discrepancies Allnutt has presented in this Motion and in his Affidavit, while not being all inclusive, are not at all hypothetical; they exist in Friedman's accounting (or lack of accounting as the case may be) of Allnutt's bankruptcy estate in case # 92-5-7401. The accounting documents Friedman created, and those that he filed with the court, are clearly erroneous, and they clearly show that Friedman failed to establish and maintain a complete accounting of Allnutt's estate assets. The false Monthly Operating Reports filed by Friedman evince that he is guilty of committing fraud on the court. They also evince that he is guilty of committing fraud on Allnutt by failing to properly account for Allnutt's assets, and by miss-appropriating/embezzling/stealing some Eleven Million Dollars ($11,000,000) of those assets during his "administration" of Allnutt's estate.

Section 153 of title 18 is specifically directed to trustees and other officers of the court. Section 153 relates to the knowing and fraudulent misappropriation, embezzlement, or transfer of property, or destruction of any estate document, by the trustee or other officer of the court. The Bankruptcy Reform Act of 1994, Pub. L. 103-394,108 Stat. 4106,4139 (1994), broadened the scope of those affected by this statute to include an agent, employee, or other person engaged by the trustee or officer of the court.

The Bankruptcy Reform Act of 1994 also added 18 U.S.C. § 156, "Knowing Disregard of Bankruptcy Law or Rule," and 18 U.S.C. § 157, "Bankruptcy Fraud." See Pub. L. 103-394,108 Stat. 4106,4140 (1994), making "Knowing Disregard of Bankruptcy Law or Rule" and "Bankruptcy Fraud" a crime. There may also be other criminal statutes that are relevant to the bankruptcy crimes committed by Friedman, including those relating to bank fraud, tax fraud,

mail and wire fraud, and money laundering.

Assuredly, at the least, Friedman is guilty of "gross negligence." However, in light of Friedman's failure to create and maintain a complete and accurate accounting of Allnutt's assets, his filing of false Monthly Operating Reports, his filing of a false Rule 2014(a) Disclosure Statement, and the high probability that he embezzled/stole some Eleven Million Dollars ($11,000,000) of Allnutt's assets during his "administration" of Allnutt's estate in case # 98-5-7401, it is quite clear that Friedman committed acts of fraud on the court and Allnutt that are worthy of criminal charges.

**Wherefore,** Allnutt moves this court to:

1. Order that Mark J. Friedman be immediately removed as Chapter 7 trustee in the instant case;

2. Order that an impartial accounting firm be employed to fully, completely, and accurately work with Allnutt to determine the actual value of the assets that Friedman unaccounted for and apparently embezzled/stole from Allnutt during his tenure as Chapter 11 Trustee in case # 92-7401 so those assets can be included in the instant bankruptcy.

3. Order all other relief it deems just and due Allnutt.

Fred W. Allnutt
10370 Baltimore National Pike
Ellicott City, Maryland 21042
(410-984-6476)

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of August 2010, I served copies of the foregoing document on Marsden S. Furlow, P.O. Box 829, Arnold, Maryland 21012; Chase Card Services, Account Inquires, P.O. Box 15298, Wilmington, Delaware 19850-5298; Mark J. Friedman, DLA Piper LLP (US), The Marbury Building, 6225 Smith Avenue, Baltimore, Maryland 21209; and, Internal Revenue Service, Fallon Federal Building, 31 Hopkins Plaza, Baltimore, Maryland 21201 by first class mail, postage paid.

Fred W. Allnutt
10370 Baltimore National Pike
Ellicott City, Maryland 21042
419-984-6476