UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | | |
|---|---|---|
| *In re:* | * | Chapter 7 |
| Fred Waters Allnutt | * | Case No. 10-24504 |
| Debtor. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**AFFIDAVIT OF FRED W. ALLNUTT IN SUPPORT OF
DEBTOR'S MOTION TO REMOVE MARK J. FRIEDMAN AS
<u>CHAPTER 7 TRUSTEE IN THE INSTANT BANKRUPTCY CASE</u>**

Comes now, Fred Allnutt, Debtor, pursuant to Rule 56, and files this Affidavit Of Fred W. Allnutt In Support Of Debtor's Motion To Remove Mark J. Friedman As Chapter 7 Trustee In The Instant Bankruptcy Case, and for this states as follows:

1. I, the undersigned, Fred W. Allnutt, whose address is 10370 Baltimore National Pike, Ellicott City, Maryland, being of legal age, sound mind, and mentally competent, do hereby make this Affidavit.

2. I have personal knowledge of the facts presented and personally know them to be true and correct.

3. I am executing this Affidavit in support of my Objection To The Appointment Of Mark J. Friedman as Chapter 7 Trustee in the Instant Bankruptcy Case.

4. On October 9, 1992, I filed for Chapter 11 Bankruptcy protection, commencing Bankruptcy Case number 92-5-7401, after the Internal Revenue Service seized my business and other assets. On October 29, 1992, Mark J. Friedman, Attorney, Piper & Marbury, 36 South Charles Street, Baltimore, Maryland 21201-3010 (hereinafter, "Friedman"), was appointed the Chapter 11 Trustee to administer my bankruptcy estate.

5. The facts and exhibits provided in this Affidavit represent my finding and the findings of several professionals employed by me to specifically examine the Monthly Operating Reports filed by Friedman and the accounting documents and records that support the Monthly Operating Reports Friedman filed during his administration of my Bankruptcy Case # 92-5-7401.

6. I, and the professionals I employed, have found that the accounting documents and records prepared by Friedman, and the Monthly Operating Reports filed by Friedman, contain very large and very serious errors, inaccuracies, inconsistencies, and discrepancies, all of which demonstrate that Friedman "miss-appropriated/embezzled/stole," some Eleven Million Dollars ($11,000,000) of my estate's assets.

7. In September of 1994, after noting many discrepancies in the Monthly Operating Reports filed by Friedman, I prepared a spreadsheet (**Exhibit 1**) to summarize the accounts receivable, cash receipts, and cash disbursements Friedman listed in the Monthly Operating Reports he filed between August 1, 1993, and July 31, 1994, and found that Friedman failed to account for $596,532.02 of my estate's assets during the August 1993 and July 1994, time period.

8. After forwarding a copy of my spreadsheet to Friedman, on September 29, 1994, I received an undated letter (**Exhibit 2**) from C.W. Amos & Company, LLC (hereinafter, "Amos"), the accounting firm employed by Friedman to perform the accounting of my estate's assets, with an attached "Analysis of 'receivables not accounted for' per schedule prepared by Fred W. Allnutt, Sr."

9. In its letter, Amos acknowledged: "Your analysis correctly identified a difference between the monthly change in Accounts Receivable and the collection of cash. In our analysis we have identified the three different types of transactions that reconcile to the column in your

schedule labeled 'Receivables Not Accounted For.'" The so-called new "transactions" Amos identify are:

- A/P & A&R Swap
- Write-offs of Accounts Receivable
- Allowance for Doubtful Accounts

10. In its analysis, Amos again acknowledged that Friedman did not report $599,977.08 in his Monthly Operating Reports filed between August 1, 1993, and July 31, 1994 (See attachment to Exhibit 2, column titled "Adjusted 'Receivables Not Accounted For'").

11. Amos' "analysis" does not support the information contained in Friedman's Monthly Operating Reports. For instance, Amos' analysis lists $300,167.00 in A/P & A/R Swaps, $287,618.08 in write-offs, and $12,192.00 in Allowance for Doubtful Accounts that are not listed in the Monthly Operating Reports filed by Friedman for the time period between August 1, 1993, and July 31, 1994.

12. Also, the A/P & A/R swaps, write-offs, and Allowance for Doubtful Accounts listed in Amos' analysis were never approved by the bankruptcy court nor did Friedman correct and re-file his erroneous Monthly Operating Reports.

13. On September 29, 1994, I wrote Amos a letter (**Exhibit 3**) outlining numerous inconsistencies in their "analysis" and asked them to provide me certain records to support their analysis.

14. Amos did not respond to my questions and providing the records I requested. Instead, Amos forwarded a second analysis (hereinafter, "Amos' second analysis"), dated October 4, 1994 (**Exhibit 4**), and stated that they "understood" my "desire for more details" regarding "the changes in the accounts receivable balances from one operating report to the next." Amos' second analysis lists categories and amounts that are either not listed in their first

analysis or are listed with different amounts. The variances between Amos' first analysis and their second analysis are as follows:

Friedman's Monthly Operating Report for the period 11/1/93 to 12/31/93:
- Amos' first analysis lists "A/P & A/R Swap" of $119,093.83.
- Amos' second analysis lists "A/P & A/R Swap" of $218,641.00.
- Amos' first analysis lists "Write-offs of Accounts Receivable" of $0.00.
- Amos' second analysis, which re-titled this category as "Reduction for Adjustments and Credit Memos," lists $85,783.
- Amos' first analysis does not contain a category titled" Previously Unrecorded Sales."
- Amos' second analysis contains a category titled "Increase For Previously Unrecorded Sales" and lists $164,095 in this category.
- Amos' first analysis does not contain a category titled "Item not listed on Cash Receipts Analysis (Bracciale)."
- Amos' second analysis contains a category titled "Item not listed on Cash Receipts Analysis (Bracciale)" and lists $2,297 in this category.

Friedman's Monthly Operating Report for the period 1/1/94 to 1/31/94:
- Amos' first analysis lists "Write-offs of Accounts Receivable" as $48,746.
- Amos' second analysis, which titled this category as "Reduction for Adjustments and Credit Memos," lists $50,190.
- Amos' first analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."
- Amos' second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $900.00 in this category.

Friedman's Monthly Operating Report for the period 2/1/94 to 2/28/94:
- Amos' September and October analysis list "A/P & A/R Swap" as $117,408. However, Friedman shows an Accounts Payable balance of $121,888.18[1] and that he dispersed $13,390.50 of this amount by check[2] and that $25,953.39 remained unpaid.[3] By subtracting the $13,390.50 and the $25,953.39 amounts from the $121,888.18 Accounts Payable balance Friedman lists, we establish that Friedman swapped $82,544.29, not $117,408, which is $34,863.71 less than the amount Amos claimed in both of its schedules.
- Amos' First analysis lists $17,435 in "Write-offs of Accounts Receivable."
- Amos' Second analysis, which titled this category as "Reduction for Adjustments and Credit Memos," lists $18,975.
- Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."
- Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $1,540 in this category.

Monthly operating report period 3/1/94 to 3/31/94:

---

[1] **Monthly operating report for 1/1/94 - 1/31/94, Bankruptcy Case # 92-5-7401, Docket No. 295, page 10.**
[2] **Monthly operating report for 2/1/94 - 2/28/94, Bankruptcy Case # 92-5-7401, Docket No. 304, page 22.**
[3] **Monthly operating report for 2/1/94 - 2/28/94, Bankruptcy Case # 92-5-7401, Docket No. 304, page 9.**

- Amos' First analysis lists $19,946.87 in "Write-offs of Accounts Receivable."
- Amos' Second analysis, which titled this category as "Reduction for Adjustments and Credit Memos," lists $23,962.
- Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."
- Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $3,745 in this category.

Monthly operating report period 4/1/94 to 4/30/94:

- Amos' First analysis lists $7,786.62 in "Write-offs of Accounts Receivable."
- Amos' Second analysis, which titled this category as "Reduction for Adjustments and Credit Memos," lists $10,975.
- Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."
- Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $2,443 in this category.

Monthly operating report period 5/1/94 to 5/31/94:

- Amos' First analysis lists $10,342 in "Write-offs of Accounts Receivable."
- Amos' Second analysis, which titled this category as "Reduction for Adjustments and Credit Memos," lists $10,882.
- Amos' First analysis does not contain a category titled, "Increase for Previously Unrecorded Sales."
- Amos' Second analysis contains a category titled "Increase for Previously Unrecorded Sales" and lists $540.

15. The Monthly Operating Reports Friedman filed between 1/1/94 and 6/30/94 list negative "Contract Revenue." However, the checks Friedman received and attached to those Monthly Operating Reports show that Friedman had positive, not negative, "Contract Revenue" during that time period. The total of the checks Friedman received establish the "actual Contract Revenue" Friedman received and which should have been reported by Friedman in his Monthly Operating Reports. By subtracting the negative "Contract Revenue" Friedman listed in each report from the positive "Contract Revenue" Friedman actual received it becomes obvious that Friedman underreported the "Contract Revenue" he received by $880,855.10. The following shows the "actual Contract Revenue" Friedman received, the amount of revenue Friedman reported during each report period, and the amount of revenue Friedman did not report:

| Report Period | Total Revenue Reported | Total Revenue Received | Total Revenue Not Reported |
|---|---|---|---|
| 1/1/94-1/31/94 | -48,746.00 | 455,250.00 | 503,996.00 |
| 2/1/94-2/28/94 | -17,435.00 | 21,965.00 | 39,400.00 |
| 3/1/94-3/31/94 | -19,947.00 | 11,974.00 | 31,921.00 |
| 4/1/94-4/30/94 | -8,531.00 | 19,860.00 | 28,391.00 |
| 5/1/94-5/31/94 | -10,342.00 | 17,732.00 | 28,074.00 |
| 6/1/94-6/30/94 | -183,362.00 | 65,711.10 | 249,073.10 |
| Totals | -288,363.00 | 532,192.10 | 880,855.10 |

16. On January 3, 1995, I received a third analysis from Amos (**Exhibit 5**) that lists Adjustments/Credits of $276,869 in September 1994 and $12 in October 1994. However, Friedman's Monthly Operating Reports for September and October 1994 do not list either of these Adjustments/Credits.

17. On March 23, 1995, 1 received a fourth analysis from Amos (**Exhibit 6**) that showed Adjustments/Credits of $3,452 in November 1994, $72,096 in December 1994, and $2,660 in January 1995. However, Friedman's Monthly Operating Reports for November and December 1994 and January 1995 do not list these Adjustments/Credits.

18. On August 28, 1997, 1 received a fifth schedule from Amos (**Exhibit 7**) that fails to list any of the $738,902 in Adjustments/Credits or any of the $173,266 in unrecorded sales Amos listed in its earlier analyses, which makes either that analysis, or Amos' earlier analyses, erroneous.

19. On November 18, 1994, Allnutt employed an independent accounting firm, The Kemplin Group, to conduct an independent audit of Friedman's accounting of his estates assets and the Monthly Operating Reports filed by Friedman. The Kemplin Group employed four independent accountants to work with and to assist them with their audit. The Kemplin Group and the independent accountants they employed were designated as "The Kemplin Review Team."

20. On January 26, 1995, the Kemplin Review Team met with Michael L. Atkinson at Amos' office, the Amos liaison who said he was "responsible for recording all accounting activity relating to the [Allnutt] Estate," to conduct their audit of Friedman's accounting records and the Monthly Operating Reports he filed.

21. On January 31, 1995, Cynthia Kemplin, President of the Kemplin Group, MBA, Ph.D. issued The "Kemplin Report," with Affidavits from the other members of The Kemplin Review Team (**Exhibit 8**).

22. One item in Cynthia Kemplin Affidavit attests that Friedman failed to account for a large amount of my estate's assets: "Based on the limited records available, [The] Kemplin Group found what appears to be a combination of discrepancies, which amount to approximately $11,000,000.00, in the accounting records filed with the court" (Exhibit 8, Affidavit of Cynthia Kemplin, page 5, ¶ 16 (pages must be counted as there are no page numbers on this Affidavit).

23. Jeffrey Coleman, CPA, JD, and a member of The Kemplin Review Team, found, amongst the other discrepancies he recorded, that: "The Accounts Receivable reports submitted to the bankruptcy court for the period October 1992 through November 1994, reflected discrepancies of $1,860,072 between beginning and ending balances, per the attached report" (Exhibit 8, Affidavit of Cynthia Kemplin, Attachment Number 3, Exhibit 1-A, ¶ 3).

24. Monthly Operating Reports that were after The Kemplin Review Team performed its audit were not reviewed by the Kemplin Team although some individual review did occur.

25. Frank L. Reis, CPA, MBA, and a member of The Kemplin Review Team, found, amongst the other discrepancies he found: "A difference of $ 9,529,916 exists between net income reported to the Bankruptcy Court and taxable income determined in the Disclosure Statement by C.W. Amos for the year ended December 31, 1993 as identified on my attached

report. Although I realize that there can be differences between net income and taxable income, these differences are substantial. Especially, since both net income and taxable income include the sale of the assets" (Exhibit 8, Affidavit of Cynthia Kemplin, Attachment Number 3, Exhibit 1-B, ¶ 3).

26. In Reis' "attached report" (attached to his Affidavit), Reis states the following:

> I have noticed an error in the Application Of Chapter 11 Trustee For Final Allowance of Chapter 11 Trustee's Commission. In paragraph 49, the trustee indicates the outstanding accounts receivables as of December 15, 1994 were $831,121. In paragraph 50, the trustee explains that the Balance was determined as follows:
>
> | | |
> |---|---:|
> | Balance September 30, 1993 | $ 2,693,857 |
> | Trustees Invoices | 888,955 |
> | Collections | (1,936,903) |
> | Write Downs | (664,191) |
>
> The actual balance using the trustee's information should be $981,718. Consequently, we have a difference of $150,597 (981,718-831,121).

27. Melvin E. Casby, Acc, MB, and a member of The Kemplin Review Team found many discrepancies that are best read in their entirety (See: Exhibit 8, Affidavit of Cynthia Kemplin, Attachment Number 3, Exhibit 1-C). Both the Affidavit of Mr. Casby and the Affidavit (See: Exhibit 8, Affidavit of Cynthia Kemplin, Attachment Number 3, Exhibit 1-D) of Wayne I. Greenfeld, B.S, in Accounting (Major in Public Accounting), and automated accounting systems specialist, and a member of The Kemplin Review Team, attest, amongst many other items, that there was no automated accounting activity, that the original accounting was dumped, that there were no source documents recording adjustment, write-offs, payable/receivables offsets, etc., that there were accounting errors in the manual accounting system utilized by Friedman, and that Friedman did not file tax returns for my estate.

28. Friedman listed six different bank accounts in his Monthly Operating Reports without explanation as to why so many, and he made numerous undocumented wire transfers

between those accounts. The Kemplin Review Team was able to determine that wire transfers occurred but were unable to trace them because of Friedman's refusal to provide any documentation to support them.

29. Friedman Monthly Operating Reports contain a list of checks and wire transfers occurring during each reporting period. I posted those checks and wire transfers on an electronic spreadsheet and found that they total $16,458,507.94 (**Exhibit 9**). However, the total of the checks and wire transfers listed in Friedman's Monthly Operating Reports is $16,152,427.85, a discrepancy of $306,080.09.

30. That my review of Friedman's Monthly Operating Reports for the period commencing August 1, 1993, and ending July 31, 1994, showed un-reported Cash Receipts of $596,532.02, un-recorded sales of $173,263, un-posted checks of $306,080.09, and un-approved (by the Bankruptcy Court) adjustments, credits, write-offs, and swaps of $789,394, all of which total $ 1,865,269.11.

31. That my analysis of the Sales, Receipts, and Accounts Receivable listed in Friedman's Monthly Operating Reports filed for the period October 9, 1992 through March 31, 1995 (Exhibit 18, line "U") and found that the values listed in Friedman's Monthly Operating Reports show un-posted and un-accounted for Cash Receipts of $1,804,252.63.

32. On March 13, 1995, Mr. Frank L. Reis notified me (**Exhibit 10**) that Friedman never posted a payment the cash he received from Heritage Heights-Sections 1&2.

33. The Rule 2014(a) Disclosure Statement Friedman filed (**Exhibit 11**) attesting that he was a "disinterested" person was or should have been known to be false. After I learned about, and disclosed, many of Friedman's connections, Friedman performed a "conflict check," something he should have done before he filed his Rule 2014(a) Disclosure Statement, for which

he charged my estate some $10,000 to perform, and then disclosed some fifty plus connections he and his law firm had with various clients, suppliers, subcontractors, and creditors of mine. One very serious "interested person" Friedman did not disclose was that Elizabeth Henn, IRS District Counsel representing the IRS in my bankruptcy case, was married to William Henn, a Piper and Marbury attorney/employee.

34. Friedman did not file any accounting of my estate's assets after May 2, 1995.

35. Friedman did not file a final account of my estate's assets as is required by Title 11 U.S.C. § 1106 and Title 11 U.S.C. § 704(9).

36. There are also other instances of Friedman's fraud and "miss-appropriation" of my estate's assets.

37. For instance, on February 3, 1994, Friedman, filed a Motion for Authority to enter into settlement agreement with Charles Kevin and Donna Marie Evans (Docket Number 279 in Bankruptcy Case # 92-5-7401). Therein Friedman stated: "The Trustee concluded that the Evans received fraudulent transfers and/or are in the possession of property of the bankruptcy estate in a cumulative amount not less than $200,000.00...."

38. The items that were the subject of that Settlement Agreement were designated by Friedman as the "race car assets." In his various pleadings and Motions submitted in the Court, Friedman listed those assets as: race car[4]; all-aluminum car trailer and contents[5]; two engines and certain tools and accessories[6]; race car transmission[7]; hydraulic lift[8]; salamander heater[9];

---

[4] Adversary Proceeding # 93-5146-JS, Docket # 7, page 7, line 23.
[5] Main case, # 92-5-7201, Docket 279, page 4, lines 6 & 7.
[6] Main case, # 92-5-7201, Docket 279, page 4, lines 7 & 8.
[7] Main case, # 92-5-7201, Docket 279, page 10, line 1.
[8] Main case, # 92-5-7201, Docket 279, page 4, line 6.
[9] Main case, # 92-5-7201, Docket 279, page 4, line 6.

air compressor10; a graduated set of three (3) Snap-On brand tool boxes11; extensive array of tools12; expensive precision tools13; tools used for the race car14; other similar tools15; payments in cash and by check16; household items, hand tools, furniture, jewelry, payments of household expenses, mortgage payments, utility payments, insurance payments17; truck18; and, tools removed from the business premises.19

39. After marshaling the race car assets into my Bankruptcy Estate, Friedman alleged that he sold those assets to Metro Recovery, a company owned and operated by Charles Lewis, Jr., who is also employed by the auction company, Miller and Miller, Inc., the company that purchased millions of dollars of my estate's assets.

40. August 25, 1994, I deposed Mr. Charles Lewis, Jr., who testified under oath that he took possession of only a few items of what may have been "Race Car Assets," that he did not take possession of the race car engine and transmission, tool boxes, tools, the truck and trailer, or household items, furniture, jewelry, etc., and that the car he took possession of had been stripped of virtually every component, that it was just a shell, and that he could not state under oath that the property he received was part of the "Race Car Assets" because there were no tags or marking on any of them.

41. Lewis further testified that, while Friedman told him to bid $28,000.00 for the assets, he had purchased only the shell of a race car for $7,000.00 and sold it for $18,000.00, and that he

---

[10] Main case, # 92-5-7201, Docket 288, page 2, line 2.
[11] Main case, # 92-5-7201, Docket 288, page 2, line 3 & 4.
[12] Main case, # 92-5-7201, Docket entry 279, page 4, lines 11-12.
[13] Adversary Proceeding # 93-5146-JS, Docket # 7, page 8, line 5.
[14] Adversary Proceeding # 93-5146-JS, Docket # 7, page 8, line 8.
[15] Adversary Proceeding # 93-5146-JS, Docket # 7, page 8, line 9.
[16] Adversary Proceeding # 93-5146-JS, Docket # 7, page 8, line 13.
[17] Adversary Proceeding # 93-5146-JS, Docket # 7, page 8, lines 16-19.
[18] Adversary Proceeding # 93-5146-JS, Docket # 7, page 7, line 24.
[19] Adversary Proceeding # 93-5146-JS, Docket # 7, page 8, line 23.

was paid by check. When I asked him if he had a Bill of Sale, he stated that he did not. When I asked if it was common practice for Metro Recovery to sell items without a Bill of Sale, he stated that it was not. When I asked if the check in payment of the race car was deposited in Metro Corporate checking account, he said it was not. Upon further questioning, Lewis change his testimony and testified that he had really sold the race car for cash, and that neither he nor anyone associated with Metro Recovery receive the cash, and that he did not know who received it.

42. Friedman did not file a Bankruptcy Rule 6004 (f)(1) statement on his alleged sale of the "Race Car Assets" to Charles Lewis.

43. Friedman spent $65,130.00 of my estate's assets in legal and associated costs to marshal the "Race Car Assets" into my estate, which he then sold to Lewis for $7,000. This represents a loss to my estate of over $37,000.00 just between what Friedman's charges for marshaling the "Race Car Assets" and the sale price of $7,000. There is, however, a much greater loss, the loss resulting from Friedman either selling or giving the baulk of that $200,000 worth of assets to some unknown and unreported party.

44. In his Monthly Operating Reports, Friedman provided the following bank accounts and account numbers for all bank accounts except that no number was provided for the First National Bank of Maryland:

- Commercial & Farmers Bank - 1014872603.
- Commercial & Farmers Bank - 1014915503.
- Commercial & Farmers Bank - 4010797503.
- Maryland National Bank - 3822632.
- Maryland National Bank - 1030444.
- First National Bank of Maryland - <u>no account number provided</u>.

45. On November 19, 1997, I served a subpoena on the first National Bank of Maryland for the bank account number for the bank account for my estate. By letter dated December 4, 1997 (**Exhibit 12**), Marcella L. Charles, Legal Assistant at First National, stated that First

National Bank could not locate any account under Friedman's name, social security number, F.I.N, number Friedman used on his other bank accounts, under the name of Piper and Marbury, or under the estate of Fred Allnutt.

46. On December 20, 1997, I advised Freedman that Friedman that First National Bank of Maryland had been unable to find any account his name, my name, or under any of the names I indicated and information I provided in the subpoena I served on First National Bank of Maryland and ask him to provide me the account number (**Exhibit 13**).

47. Friedman also did not identify or provide an account number for the Piper & Marbury account where he deposited hundreds of thousands of my estate's funds. Friedman admitted in correspondence (**Exhibits 14, 15, 16, 17, & 18**) that he deposited some $354,000 of my estate finds into a Piper & Marbury account.

48. By letter dated November 30, 1992 (Exhibit 14) Friedman identified twelve checks totaling $53,580. By letter dated December 21, 1992 (Exhibit 15) Friedman acknowledged that he deposited that $53,580 in a Piper & Marbury bank account. Friedman also acknowledged in Exhibit 15 that he deposited four more checks totaling $9,915 in a Piper & Marbury bank account.

49. By letter dated February 17, 1993 (Exhibit 16), Friedman acknowledged that he had deposited four more checks totaling $18,740 in a Piper & Marbury bank account.

50. By letter dated March 10, 1993 (Exhibit 17), Friedman acknowledged that he had deposited twenty-three more checks totaling $156,565.05 in a Piper & Marbury bank account.

51. By letter dated June 8, 1993 (Exhibit 18), Friedman acknowledged that he had deposited nine more checks totaling $115,438.171 in a Piper & Marbury bank account.

52. By letter dated October 23, 2000 (**Exhibit 19**), I asked the Piper & Marbury "Trust Account Records Custodian" to "provide to me in writing a full accounting of all assets

deposited by Mr. Friedman in the Piper & Marbury account(s), and the disposition of those deposits..." and for other information. The Piper & Marbury "Trust Account Records Custodian" did not respond.

53. By letter dated January 25, 2001 (**Exhibit 20**), I again asked the Piper & Marbury "Trust Account Records Custodian" to "provide the information I asked for in my October 23, 2000 (Exhibit 19), letter.

54. Neither the Piper & Marbury "Trust Account Records Custodian" nor anyone else at Piper and Marbury responded to my letters (Exhibits 19 and 20).

_____
Fred W. Allnutt

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief and that the Exhibits attached hereto are exact copies of the originals.

_____
Fred W. Allnutt
10370 Baltimore National Pike
Ellicott City, Maryland   21042          Executed on the 9th day of August, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of August 2010, I served copies of the foregoing document on Marsden S. Furlow, P.O. Box 829, Arnold, Maryland 21012; Chase Card Services, Account Inquires, P.O. Box 15298, Wilmington, Delaware 19850-5298; Mark J. Friedman, DLA Piper LLP (US), The Marbury Building, 6225 Smith Avenue, Baltimore, Maryland 21209; and, Internal Revenue Service, Fallon Federal Building, 31 Hopkins Plaza, Baltimore, Maryland 21201 by first class mail, postage paid.

_____
Fred W. Allnutt
10370 Baltimore National Pike
Ellicott City, Maryland 21042
419-984-6476